## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| T & C INVESTING CORP., individually and on behalf of all others similarly situated,<br><br>         Plaintiff,<br><br>  v.<br><br>CHRISTOPHER ALEXANDER DELGADO and GOLIATH VENTURES INC.,<br><br>         Defendants. | Case No. _____<br><br>Class Action Complaint<br><br>**Jury Trial Demanded** |

## INTRODUCTION

1. For the past several years, Christopher Alexander Delgado and his company Goliath Ventures Inc. offered investors the opportunity to receive safe and stable returns from cryptocurrency liquidity pools. The pitch was that investors' funds would be contributed to collections of cryptocurrency that provide asset liquidity to traders on certain exchanges. Investors would not need to do much other than send money to Goliath. Goliath told investors that they would receive guaranteed monthly returns of between 3-8% as well as a guarantee that their principal investment would be preserved.

2. Goliath's marketing campaign and referral network were successful. Over a three-year period, the company collected over $300 million from investors across various states and in Canada. Until recently, investors were receiving the monthly returns that Goliath promised them, and some investors were able to withdraw their principal from the company.

3. When Delgado was arrested by federal authorities and charged with wire fraud in February 2026, however, it quickly became apparent that he had actually been running a Ponzi scheme. Instead of placing investors' money in liquidity pools, Delgado and Goliath kept nearly

all of it in the company's traditional bank accounts and cryptocurrency wallets. They used investor money to fund lavish personal and corporate expenses, and to pay purported returns to existing investors.

4. Payments to investors have now been suspended, and it is likely that much of investors' principal investments have been lost to Goliath's fraudulent business. Plaintiff T & C Investing Corp. is among those investors who have lost their savings as a result of Delgado and Goliath's scheme. On behalf of itself and other investors like it, T & C seeks to hold Delgado and Goliath accountable.

## PARTIES

5. Plaintiff T & C Investing Corp. is a New York corporation with its principal place of business in Huntington, New York.

6. Defendant Christopher Alexander Delgado is an individual who resides in Windermere, Florida.

7. Defendant Goliath Ventures Inc. is a Wyoming corporation with its principal place of business in Orlando, Florida.

## JURISDICTION AND VENUE

8. The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d)(2) because this is a class action in which the amount in controversy exceeds $5,000,000, exclusive of interest and costs; in the aggregate, there are more than 100 members in the proposed class; and at least one class member is a citizen of a state different from Defendants.

9. The Court has personal jurisdiction over Defendants because Goliath's principal place of business is in Florida, and Delgado resides in Florida. The conduct at issue in this case emanated from Florida.

10. Pursuant to 28 U.S.C. § 1391(b), venue is proper in the Southern District of Florida because a substantial part of the events and omissions giving rise to the claims occurred in this District, including the solicitation of investors who reside in this District, the dissemination of marketing materials to investors who reside in this District, and the transfer of capital to Goliath's bank accounts from investors who reside in this District.

## FACTUAL ALLEGATIONS

### A. The Goliath Ventures Ponzi Scheme

11. Christopher Alexander Delgado established Goliath Ventures in 2019. He initially called it Gen-Z Venture Firm, but changed its name to Goliath in 2021. Delgado served as the president and chief executive officer of the company.

12. Goliath marketed itself as a private fund that invested in blockchain and cryptocurrency projects. The company employed associates to solicit investors through presentations and marketing materials. Delgado and his associates told potential investors that their money would be placed in liquidity pools, where it would earn passive income. A liquidity pool is a collection of cryptocurrency held in a smart contract, or a digital agreement stored on a blockchain network. The purpose of a liquidity pool is to facilitate trades of cryptocurrency on a decentralized exchange. Those who deposit into a liquidity pool typically receive a portion of transaction fees or other incentives generated by trading activity within the pool.

13. Delgado and Goliath made specific representations to investors about how the company would use their funds. They told investors that their money would move from a

traditional bank account in Goliath's name to Coinbase, then to an encrypted ledger, and then to liquidity pools that would generate returns for them. The liquidity pools would run on one or more exchanges, such as Uniswap. Goliath included the below illustration of this investment cycle in its marketing materials:



14. Individuals could become investors by entering into "Joint Venture Agreements" with Goliath. The agreements detailed how Goliath would place investor money in liquidity pools and distribute returns on investments. The agreements sometimes guaranteed monthly returns ranging from 3-8% and/or guaranteed the return of an investor's principal. Goliath gave investors the option to withdraw their monthly returns or "roll over" monthly returns, which would increase their account balances.

15. Goliath's marketing materials described its investment strategy as one that entailed active monitoring and risk management. They mentioned risk management tools such as stop-loss mechanisms, slippage monitoring, and centralized exchange hedging.

16. Goliath provided investors with access to an online account portal that supposedly displayed real-time account activity, including the investor's principal and amount of returns. The portal showed consistent monthly gains for each investor.

17. The problem for investors is that the representations Goliath made in its marketing materials, joint venture agreements, and online portal were false. Instead of placing investor funds in liquidity pools, Delgado was using those funds to pay for his lavish lifestyle and—in classic Ponzi-like fashion—using new investor funds to pay previous investors. Of the over $300 million Delgado and Goliath obtained from investors from January 2023 through January 2026, only $1.5 million was actually deposited into a liquidity pool.

18. The reporting that Goliath provided to investors in its online portal was fraudulent. While the amount of principal investments that the portal displayed were accurate, the reported returns (displayed as "Monthly Distribution Rates" and "Monthly Distribution Balances") were not generated from a liquidity pool or any investment activity. Goliath falsified the rate of return displayed for each investor to match the rate of return that it promised to him.

19. Over $300 million in investor money was deposited in Goliath's traditional bank accounts at JP Morgan Chase and Bank of America, and over $60 million in investor funds was deposited in its cryptocurrency wallets at Coinbase. The investor funds that were converted to cryptocurrency were held in USD Coin (or USDC), a stablecoin designed to maintain a 1:1 peg to the US dollar.

20. Delgado was the sole signatory on Goliath's account at JP Morgan and a co-signer on its account at Bank of America. He controlled both accounts. Delgado used investor funds from both accounts for personal expenses and Goliath's corporate spending. For instance, in July 2025,

he transferred $500,000 from the Bank of America account and used it towards the purchase of a property in Florida held in his name.

21. Substantial sums of money in Goliath's JP Morgan account, Bank of America account, and Coinbase wallets were transferred to existing investors. Between January 2023 and June 2025, Goliath transferred $50 million from its JP Morgan account to investors. The company told investors that these payments were returns on their liquidity pool investments, but in reality, that money came from new investors. Similarly, between May 2025 and September 2025, $11 million from the Bank of America account was used to fund purported returns to investors, even though those funds also came from new investors.

22. The Goliath fraud started unfolding in late 2025, when the company began delaying payments to investors. Goliath and Delgado provided varying excuses for the delays, such as audits and compliance issues, while assuring investors that payments would resume in short order. Around the same time, Goliath denied several investors' requests for a return of their principal.

23. On February 24, 2026, Delgado was arrested and charged with money laundering and wire fraud in connection with the operation of Goliath. Since then, all payments to investors have been suspended, investors have been unable to access Goliath's mobile application, and questions about where their investments stand have gone unanswered.

B. **Plaintiff's Experience**

24. Between December 2024 and September 2025, Plaintiff T & C Investing Corp. invested $1,160,000 with Goliath Ventures.

25. The CEO of T & C learned of the opportunity to invest in the venture from a friend who knew Delgado and who had also invested with Goliath. Goliath, through one of its employees Michael Hernandez, told T & C via e-mail in late 2024 that its investment funds would be placed

in a liquidity pool that ran on a decentralized cryptocurrency exchange, and that it would receive monthly interest payments generated by that liquidity pool. T & C relied on those representations in deciding to invest.

26. On or about December 19, 2024, T & C executed a joint venture agreement with Goliath. On or about December 19, 2024, Delgado executed the joint venture agreement on behalf of Goliath. The agreement stated that T & C would contribute funds for placement into liquidity pools and that it would be entitled to monthly interest from its contribution. Through the agreement, Goliath guaranteed the return of T & C's principal contribution. Goliath also guaranteed that if T & C elected to withdraw some or all of its investment, Goliath would process the withdrawal request within a 24-to-72-hour period.

27. On or about December 30, 2024, per Goliath's instructions, T & C wired $500,000 to Goliath's bank account. Subsequently, T & C funded a total of $660,000 more in additional investments, also purportedly for placement into liquidity pools.

28. T & C received monthly communications from Goliath about its new account balance, which reflected the monthly interest its investment was accruing. T & C primarily "rolled over" its monthly returns.

29. During the period it was making investments, T & C was never informed of the true nature of how Goliath and Delgado were using its money. Had it known the truth, T & C never would have invested in Goliath.

30. To date, T & C received payments of approximately $211,246 in purported returns on its investments. The losses T & C has incurred have caused hardship to T & C and its CEO.

## TOLLING OR NON-ACCRUAL OF STATUTES OF LIMITATIONS

31. Plaintiff and the proposed Class did not and could not have discovered the facts constituting Defendants' unlawful conduct until February 24, 2026, when Delgado was arrested and charged with money laundering and wire fraud.

32. Because Plaintiff and Class members could not have reasonably discovered the facts constituting Defendants' unlawful conduct until February 24, 2026, their claims accrued on that date and any applicable statutes of limitations were tolled until that date.

## CLASS ACTION ALLEGATIONS

33. Pursuant to Federal Rule of Civil Procedure 23, Plaintiff brings this action on behalf of itself and the following Class:

*All natural and legal persons who invested money with Goliath Ventures Inc.*

34. Excluded from the Class are Defendants; their parents, affiliates, subsidiaries, legal representatives, predecessors, successors, assigns, and employees; persons who received more money back from Goliath in connection with their investments than they contributed; and any judge to whom this case is assigned, his or her spouse, and all persons within the third degree of relationship to either of them, as well as the spouses of such persons.

35. Class membership will be determined based on objective criteria including whether any person transmitted money to Goliath for investment in liquidity pools. Documents identifying the investors in the Class are in the possession, custody, and control of Defendants.

36. <u>Numerosity</u>. The members of the Class are so numerous that joinder of all members is impractical. The size of the Class, which is estimated to consist of hundreds if not thousands of individuals and business entities, can be ascertained only through discovery.

37. <u>Typicality</u>. Plaintiff's claims against Defendants are typical of the claims of the members of the Class. Plaintiff and Class members were all victims of the fraudulent scheme, each has claims against Defendants relating to the scheme, and each claim will depend on common proof of Defendants' wrongful conduct.

38. <u>Adequacy</u>. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and financial fraud litigation.

39. <u>Commonality and Predominance</u>. Common questions of law and fact exist as to all members of the proposed Class and predominate over any questions solely affecting individual members of the proposed Class. The questions of law and fact common to the class include:

   a. Whether Defendants misrepresented the nature of their business venture;

   b. Whether Defendants concealed information about the nature of their business venture;

   c. Whether Defendants' misrepresentations and omissions were material;

   d. Whether Defendants' actions were the actual and proximate cause of Plaintiff's and Class members' damages.

40. <u>Superiority</u>. A class action is superior to other available means for the fair and efficient adjudication of this dispute. The injury suffered by each Class member, while meaningful on an individual basis, is not of such magnitude as to make the prosecution of individual actions economically feasible. Even if Class members themselves could afford such individualized litigation, the court system could not. In addition to the burden and expense of managing many actions arising from the same fraudulent scheme, individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense

to all parties and the court system presented by the legal and factual issues of the case. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

41. In the alternative, the proposed Class may be certified because: (a) the prosecution of separate actions by the individual members of the proposed Class would create a risk of inconsistent adjudications; (b) the prosecution of individual actions could result in adjudications, which as a practical matter, would be dispositive of interests of non-party class members or which would substantially impair their ability to protect their interest; and (c) Defendants have acted or refused to act on grounds generally applicable to the proposed Class, thereby making appropriate final and injunctive relief with respect to the members of the proposed class as a whole.

## FIRST CAUSE OF ACTION
### Fraud

42. Plaintiff alleges this cause of action on behalf of itself and the Class, and in doing so, incorporates all preceding allegations.

43. Defendants fraudulently induced Plaintiff and Class members into believing they were investing in cryptocurrency liquidity pools. In reality, Plaintiff's and Class members' investment money was being used to fund Delgado's personal expenses and to pay prior investors. Defendants knew their statements and omissions to be false and/or misleading.

44. Among other fraudulent conduct, Defendants made the following material misrepresentations and omissions:

   a. Through a uniform joint venture agreement, Defendants falsely told Plaintiff and Class members that their investments would be placed into liquidity pools;

   b. Falsely promised monthly returns on their investments;

   c. Falsely guaranteed the return of their principal investment;

    d.  Falsely promised that investors could remove their money at any time;

    e.  Concealed from Plaintiff and Class members that Defendants were operating a Ponzi scheme by using all or nearly all investor money to pay purported returns to earlier investors and fund Defendants' corporate and personal expenses.

45.    Defendants knew these misrepresentations and omissions were false and/or misleading, but made them to Class members with the intent to induce Class members to rely on them.

46.    Plaintiff and Class members reasonably relied to their detriment upon these misrepresentations and omissions when they invested money with Defendants.

47.    As a direct and proximate result of Defendants' fraudulent conduct, Plaintiff and Class members sustained damages in an amount to be determined at trial. Plaintiff and Class members seek all available remedies, including damages, punitive damages, and restitution from Defendants plus accrued and accruing interest, costs, and all other relief deemed fair and just.

## PRAYER FOR RELIEF

Wherefore, Plaintiff, on behalf on itself and all others similarly situated, request that the Court enter a judgment awarding the following relief:

    a.  An order certifying the proposed Class and appointing the undersigned counsel as class counsel;

    b.  An award of actual damages, compensatory damages, rescission, restitution, punitive damages, and all other forms of monetary relief provided for or made available by law or equity;

    c.  An award of Plaintiff's reasonable attorneys' fees and litigation costs; and

    d.  Such other and further relief as this Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury as to all issues so triable.

Respectfully submitted: March 11, 2026

*/s/ Ryan Schwamm*

**SILVER LAW GROUP**
Scott L. Silver
Florida Bar No.: 095631
Ryan A. Schwamm
Florida Bar No.: 1019116
1780 W. Sample Road
Coral Springs, FL 33065
T: (954) 755-4799
F: (954) 755-4684
E-Mail: ssilver@silverlaw.com
rschwamm@silverlaw.com

*/s/ Linda P. Lam*

**GIBBS MURA LLP**
David Stein (*pro hac vice* to be submitted)
Linda P. Lam (*pro hac vice* to be submitted)
1111 Broadway, Suite 2100
Oakland, CA 94607
T: (510) 350-9700
F: (510) 350-9701
E-Mail: ds@classlawgroup.com
lpl@classlawgroup.com

Emily Beale (*pro hac vice* to be submitted)
136 Madison Avenue, Suite 541
New York, NY 10016
T: (510) 350-9700
F: (510) 350-9701
E-Mail: eb@classlawgroup.com